No. 1,218.

HEIRS OF R. H. McGEHEE VS. J. W. McGEHEE, ADMINISTRATOR.

1. An administrator is an officer appointed by the court to discharge certain duties. As such he must be considered as present before the court, in the nature of a party in the proceedings there pending. Prescription has no commencement in his favor, at least before the homologation of his final account.

2. One, who undertakes the administration of a succession domiciled in this State, cannot exonerate himself from suit by the heirs for the rendition of an account of his administration, by removing his domicil and citizenship to another State.

3. Parties who lay by for a long period of time, without asserting their claim, and who suffer the circumstances which accompanied a transaction to fade from the memory of the vicinage, ought not to complain that less rigid evidence is required, nor ought they to gain by their acquiescence, while the transaction was yet recent, and when more complete evidence might have been obtained.

APPEAL from the Fifth District Court, Parish of Ouachita. *Richardson*, J.

*Franklin Garrett*, for Plaintiffs and Appellants.

*John T. Ludeling* for Defendant and Appellee.

The opinion of the Court was delivered by

WATKINS, J. Mrs. Sarah E. Porter, and the children and sole heirs at law of Mrs. Lucinda Scott Calloway, deceased wife of John B. Calloway, deceased, of the State of Alabama, alleging themselves to be collateral heirs of Robert H. McGehee, deceased, a citizen of the Parish of Ouachita, in this State, who died intestate in 1862, leaving some property therein, an interest in which they claim to have inherited of one-fourth to each — that is to say, one-fourth to Mrs. Porter, and one-fourth to the children of Mrs. Calloway — the two remaining heirs being Mrs. M. J. Phillips, of Ouachita parish, a sister, and James W. McGehee, of the State of Texas, a brother of the deceased institute this suit.

Petitioners allege that, at the time of the death of Robert H. McGehee there was a public inventory taken of the effects of his succes-

sion in the Parish of Ouachita, and that the appraisement thereof amounted to $10,468 91.

That James W. McGehee, alleging himself to be a creditor of his brother's succession, petitioned for the appointment of himself as administrator of said succession, and secured the appointment, and executed bond as such, in the sum of $13,125, with John T. Ludeling and John L. Byrne, then of the Parish of Ouachita, as securities.

That, on the 29th of November, 1862, at the instance of certain persons claiming to be creditors of said succession, said administrator procured an order for the sale of the "negro property of said succession;" that on the 6th of December following, said property and some personal property was sold, and the proceeds of sale aggregated $4770 in cash, which amount the administrator received.

Petitioners further represent that the said administrator has never rendered and filed any account of his administration, nor paid over to them any portion of said funds.

That the succession was entirely solvent when it was opened, and free of debt; and that it owes no debts at this time.

That the administrator has in his possession said funds of the succession, and should render an account thereof, and should pay "ten per cent *per annum* interest on all sums received by him from a date beginning twelve months after receipt."

They pray that said administrator be compelled to render an account, be removed from his trust, decreed to pay ten per cent per annum interest on all sums of money which came into his hands, and that they be put in possession of their respective interests in said succession.

On this petition the court made an *ex parte* order requiring the defendant administrator to "render a full, fair, and perfect account of his administration by the 5th day of September, 1837"—the petition having been filed on the 24th of June previous. Of this proceeding, due notice was served on the said sureties in person, and a curator *ad hoc* was appointed to represent, and act for the absent defendant and administrator.

The curator filed a plea of prescription of five, ten and twenty years, in bar of plaintiffs' action, and same having been referred to the merits, he filed an account of the defendant's administration, and an accompanying explanatory statement.

To this account the petitioners file an opposition, in which they set out numerous objections, and, substantially, pray for like judgment against the administrator, as in their original petition.

At this stage of the cause, **J. H. McGehee** *individually* appears, through John T. Ludeling as counsel, and tenders, and causes to be

filed a peremptory exception to the effect that he is a resident citizen of the State of Texas, and any "attempt to bring him into this court, by the appointment of a curator *ad hoc*, by virtue of any State law, is illegal, null, and void, being in contravention of the Fourteenth Amendment of the Constitution of the United States."

This exception having been overruled, the counsel of McGehee filed an answer *in extenso*, and, after an elaborate trial, the case went to judgment, and the demands of plaintiffs were rejected, and from that decree the plaintiffs appeal.

The curator *ad hoc* requests that the judgment be so amended as to allow him a fee of $100 00, and that same be taxed as cost in the case.

I.

The plea of prescription is the first matter to be disposed of.

The theory of McGehee's counsel is that the slaves owned by the succession were sold in December, 1862, under an order of the probate court of Ouachita, for cash, in Confederate States Treasury notes, and that therewith the debts and obligations of the deceased were paid, the expenses of administration settled, and the balance paid over to, and distributed among the known heirs of the deceased. That the real estate which figures upon the inventory, was not sold, but was taken into corporal possession by the said heirs, and put in custody of an agent, to whom they gave a written power of attorney authorizing sales thereof. That this *extra* judicial settlement was effected in the month of December, 1862, and terminated his trust as administrator, and, since that date he has performed no official act as administrator; but, on the contrary, considering the administration at an end, he removed from this State, and established his abode in the State of Texas, where he has since resided, and now resides. This suit was filed on the 25th of June, 1877, nearly twenty-five years since these transactions are alleged to have taken place.

The exceptor's contention is that the action to compel the legal representative of a succession to account is in the nature of an action of mandate, subject to the prescription of ten years, and that the period of ten years has run against the plaintiffs' action—it having begun either on the — day of December, 1862, when the debts were paid and settlement with the heirs was made, or on the 9th of March, 1869, when the compromise of the Calhoun judgment was made, or in 1872, when their duly appointed agent made sales of the interests of petitioners and other heirs, in certain portions of real estate they inherited from the decedent.

In succession of Powell, 38 Ann. 184, we said that "we consider it perfectly clear, that when the succession is wound up, and all the debts paid, and only the property remains in the hands of the administrator, the purposes of the legal agency confided to him are accomplished, and it is the absolute right of each and every heir to terminate it, and claim possession of his share of the succession."

And in succession of Baumgarden, 36 Ann. 50, we said that, "after the heirs of age are recognized, there being no necessity for further administration, and the law having accepted the succession under benefit of inventory for the minor, (R. C. C. 977) the succession will have been wound up, and the executors under the obligation of rendering an account to the heirs of age, etc." Succession of Geddes, 36 Ann. 963.

These principles have been so repeatedly announced in the opinions of our predecessors, as well as in our own, that they have become consecrated in jurisprudence. They not only announce that when the debts of the succession have been paid, the functions of the administrator are suspended of right, but that he remains under an obligation to render an account to the heirs, nevertheless.

True it is that our predecessors decided, in Wilson vs. McGrail, that "according to the law prior to the Act of 1837, the office of a curator of a vacant estate *terminated* at the expiration of one year from the date of his appointment, and that all that remained to him to do, afterwards, was to render an account. The action to compel him to render the account, appears to us to be one in the nature of the action of mandate, and subject to the prescription of ten years." 12 Ann. 358.

With some slight variation in verbiage the same principle was applied in Duanco vs. Montgomery, 13 Ann. 514, the court saying:

"As the law stood at the time the will was admitted to probate, the office of the testamentary executor *expired* at the end of the year, except it was otherwise expressed in the will, or the term of office was prolonged by the judge.　＊　＊　＊　＊　＊　＊　＊　＊　＊

"This being the case, the executor could not, after the expiration of the year, be said to be any longer in court. And being *but a mandatory*, nothing remained for him to do but render his account.　＊　＊　Then an action must exist to compel *the mandatory of the legatees* to render an account." The court then decided that the action came within the principle of Wilson vs. McGrael *supra*, and was prescribed by ten years.

But is that principle applicable under the law, as it now stands? We think not. Under the provisions of the code the functions of an administrator do not cease *absolutely* at the expiration of one year, but continue from year to year, until he be formally discharged by the authority

which appointed him. The code says that "curators of vacant successors shall, * * at least once in *every* twelve months, render *to the court* from which they received their appointment, a full, fair and perfect account of their administration, etc." R. C. C. 1191.

"As soon as the heirs * * have been thus put in possession of the succession * * the curator is bound to render *a* faithful and exact account *of his administration to him,* and to pay the balance due, etc." R. C. C. 1194. The account contemplated, is a *final* account, undoubtedly. Then, it is perfectly manifest, that this account must be homologated, and the administrator discharged, and his bond cancelled, before his *functions* as administrator *cease,* and his trust *terminated.*

This being clear, then is it not equally clear that the administrator does not cease to be a trustee or agent of the heirs, until his account has been homologated? We think so. Then it is equally clear that his relations, during the period of his default in filing his account, are not those of a mandatory, and prescription does not run in his favor.

In keeping with this view, our predecessors held, in Courtade vs. Chamberlain, that "with regard to the plea of prescription, we have to remark that it is clearly untenable. * * Chamberlain was an officer appointed by the court to discharge certain duties. As such, he must be considered as present before the court, in the nature of a party in the proceedings then pending. Prescription had no commencement in his favor, at least, before the homologation of an account." 4 Ann. 368.

In Wilson vs. McGrael *supra,* the court said: "This case does not come within the rule laid down in Courtade vs. Chamberlain, 4 Ann. 368."

A careful examination of the authorities has satisfied us that the district judge properly overruled the defendant's plea of prescription.

## II.

While no importance has been attached to the exception to the jurisdiction of the court *a qua,* filed for McGehee, yet we deem it of sufficient importance to receive a passing notice, merely to make it plain that it was not well taken. The theory of this defendant is that this action is in the nature, and partakes of the character of a strictly personal action and this proceeding cannot be entertained, nor judgment rendered against him in a court of the State of Louisiana, he being a citizen of a different commonwealth, the State of Texas. "The question is one of Federal constitutional law," and is controled by the decisions of the Supreme Court. *Vide* Hackness vs. Hyde, 98 U. S. 478, and Pennoyer vs. Neff, 95 U. S. 714.

In the recent case of Laughlin vs. The Louisiana and New Orleans Ice Company, 35 Ann. 1184, in applying the principle announced in those cases, we said that "substituted service can be effectual against non-residents as 'due process of law,' *only* when, in connection therewith, *property in this State is brought under the control of the court*, and subjected to its disposition, by process adapted to that purpose." See, also, McKenzie vs. Bacon, 38 Ann. 764.

It appears from the record that the deceased resided in the Parish of Ouachita, this State, and owned a considerable estate there, at the time of his death. The defendant, J. W. McGehee, also resided there, at that time. Both were enlisted as soldiers, in the Confederate army, and the deceased was killed in battle at Malvern Hill. After the close of the war, the defendant removed to the State of Texas, and has since resided there. But, in the meantime, and while yet a citizen of this State, he petitioned to a court of this State, to be appointed administrator of the succession of his brother, secured the appointment, executed bond as such, took possession of the effects and property of the succession, and as such caused a large portion thereof to be sold, and converted into money. Surely it cannot be seriously contended that he has exonerated himself from suit, by the heirs of that succession, in the court which appointed him to that trust, for the rendition of an account of his administration, and before he has been judicially discharged. The plea is not good and cannot be maintained.

### III.

On the merits, we are disposed to view this as a suit for the recognition and enforcement of a "stale claim," which has been permitted to slumber, for well nigh twenty-five years. The learned judge of the lower court, in his opinion, very justly observed that "it is worthy of consideration that the facts out of which this litigation arises, occurred more than a quarter of a century ago, and at a time of intense excitement and trouble, caused by a prevailing revolution between the States of this Union, when judicial as well as other proceedings—where they existed—were not as exact and precise as (they) should have been; when the exigencies of the times required the absence of officers, as well as private individuals; and the means and modes of communication with others, at home and abroad, were almost entirely cut off or impaired. After the lapse of such a length of time, it is natural that the memory of witnesses has become clouded, and other means of proof may have been lost or impaired, and the same strictness of proof as to payments, as well as other facts should not, and will not be required. The lapse

of time, and staleness of demand will, to some extent, come in aid of testimony not in itself conclusive."

In Baker vs. Towles' administrator, 11 La. 433, our early predecessors very truly said :

" Parties who lay by for so long a period of time, without asserting their claim ; who suffer the circumstances which accompanied a transaction to fade from memory of the vicinage, and even of those officially concerned in it, ought not to complain that less rigid evidence is required, nor ought they to gain, by their own acquiescence while the transaction was yet recent, and when more complete evidence might have been obtained."

In Heirs of Davenport vs. Labauve and Landry, 5 Ann. 141, the court said that " the lapse of time and the staleness of the demand, come in aid of the testimony as to the fact of payment," and repeated what was said in Baker's case *supra* with approval.

In Wood vs. Egan, 39 Ann. 685, we borrowed from Rodenheimer's case, 35 Ann. 1006, a paragraph which even more tersely expresses the same views in these words, viz :

" A stale claim, long withheld from presentation or prosecution, until he, against whom it is preferred, has died, must be established with more than reasonable certainty. An unfavorable presumption is created by delay. It can be removed only by peculiarly strong and exceptionally conclusive testimony." * * * " These conclusions are supported by good and conservative authority. Davenport's case, 5 Ann. 141; Simpson's case, 7 Ann. 555; Succession of Rea, 14 Ann. 317; Manning's Unreported Cases, pp. 98, 121, 339; Cutter vs. Succession of Collins, 37 Ann. 95."

Now, what are the leading substantial facts as shown by the record ? They are that at the date of the death of the decedent in 1862—he having died without forced heirs—the defendant McGehee, through solicitations of his co-heirs, obtained a leave of absence from his command in the army, and made a visit to his home in Ouachita parish, for the purpose of settling up his brother's succession. While there he caused an inventory to be made, and himself appointed administrator thereof. This inventory shows lands valued at a little over $3000, a small amount of personal property, and rights and credits, and some negro slaves valued at about $3500. Soon after, he ascertained that the deceased owed some debts, which were due principally to Byrne & Shields and J. P. Crosley. One of several hundred dollars was due to himself. To pay them, he petitioned for and obtained an order for a sale of the *personal property and slaves.* At the sale about $4500

was realized in *Confederate* Treasury notes. With this depreciated paper he managed to settle the debts of the deceased, and liquidate and settle the succession debts and charges, and the resulting balance he turned over to the counsel for absent heirs, for settlement and distribution among the heirs. He then returned to the army, where he remained until the close of the war in 1865, and soon after he removed to Texas, where he has since resided.

At the time of these transactions the heirs of the deceased were of full age, and by whom no question was ever raised, in reference to the disposition made of the surplus of confederate money which the administrator left in the hands of the attorney appointed to represent them, until about the time this suit was filed; and it is this fund which constitutes the *gravamen* of petitioner's complaint.

Soon after the close of the late war, one Byrne, claiming to have due authority from the heirs, accepted $500 in United States currency, in settlement and compromise of a debt against one Calhoun, for $1100 and interest. His authority to represent them, and make this settlement, is stoutly denied by the plaintiffs, and even Byrne does not recollect it; yet, we are fully satisfied, from the receipt of Byrne, which is written upon the reverse of the petition in the suit of McGehee vs. Calhoun, the attending circumstances, and the testimony of other witnesses, that the compromise was authorized and made. The transaction took place in the office of Morrison & Farmer, reputable lawyers of Monroe, and Calhoun swears, as a witness, that "Byrne was authorized by letters, which were read to Morrison, who said, ' go ahead, then.' "

This money was paid to Mrs. Phillips, one of the heirs, who sent their proportionate shares to the plaintiffs.

Several years after this transaction plaintiffs and other heirs took possession of the lands they inherited from the decedent's estate, and appointed an agent to sell the same. He sold some of them many years ago, and those remaining were thereafter sold for taxes, and the titles have passed to various third persons since.

On this state of facts the district judge observes, that "it is not a violent conclusion, in view of the evidence and all the circumstances in this case, although the testimony may not be positive and conclusive of itself, that there was an extra judicial settlement and understanding as to what had been done, and what was to be done, and left undone, in December, 1862, as to the property remaining undisposed of."

We are in perfect accord with his views. When we reflect upon the fact that this contention is virtually one over the value or price of negro slaves, that were sold in 1862, only a short time prior to the promulga-

tion of the Emancipation Proclamation, liberating them from bondage; and the further fact that the sale was made for Confederate money, then of a greatly depreciated value, and which soon afterwards became utterly valueless, we cannot refrain from expressing our surprise that such a claim is preferred. We think the heirs should rather have congratulated themselves upon having been so fortunate as to have realized on such values in the discharge of their brother's debts, and thus secured to themselves the more substantial part of his fortune as an inheritance.

Without reciting in detail the facts, we are of the opinion that there should have been an allowance of $100 made in favor of the curator *ad hoc*. It is, therefore, ordered and decreed that the judgment be so amended as to allow, in behalf of the curator *ad hoc*, a fee of $100, to be taxed as costs in the case, and that otherwise, judgment be affirmed.

## On Application for Rehearing.

Complaint is made of a statement in our opinion to the effect that Mrs. Phillips should have said that she had received and sent to the plaintiffs the respective shares of the amount realized from the Calhoun compromise. This is slightly inaccurate. She did say that she had received their shares of the cash proceeds of the sales made by Col. R. Richardson as their agent, and carried same to them. This caused our mistake, as the two funds are spoken of in the same conversation. This is a part of her statement on the last trial of the cause, and to which there is no reference in counsel's brief. But what is to the same effect as our quotation is that this witness says, that in 1871 she corresponded with the plaintiffs in reference to the settlement and compromise Byrne had made of the Calhoun debt, and they had written her letters on the subject, and requested her to see Mr. Byrne and " collect it and come to Alabama," and pay her expenses out of it.

This shows that if they did not receive it, they had full knowledge of the transaction and did not repudiate it.

Rehearing refused.